Good morning, we'll call the first case for today, which is United States of America versus Richard Stanley. Mr. Moyers. I would like to reserve three minutes for rebuttal. May it please the court. This case is not like Kylo. This case is Kylo. Corporal Eardley conducted a warrantless search of Mr. Stanley's home when he used a Moocher Hunter, a sense-enhancing device, to gather information about... There was nothing voluntary, and Kylo, the defendant in that case, didn't do anything to expose himself. I disagree, Your Honor. Haven't you conceded that your client disclosed the existence of his wireless signal as well as his private IP address and the 95 MAC address? Yes, all those were exposed. That there was in existence a signal, just as Mr. Kozakowski revealed that he was transmitting and receiving a signal as well. But that's what's crucial, I think, for us. So that is what has been disclosed here, right? And that's the information, that there is a wireless card out there that's transmitting. Is that information? Is that information? For example, in Smith v. Maryland, we've got information, we've got data, we've got DNR numbers. Yes. Where's the information here? Well, that's what the third-party doctrine talks about, is that it's a disclosure of information. The disclosure that there is a wireless signal, that there is a wireless card with that number transmitting and receiving information, the ones and zeros, the data. But there's no content to that information as there was in Smith? Of course there's content in that information. But isn't it a different form of content? I suppose it's different from the numbers dialed in, but that's still you're transmitting data, information, ones and zeros, via a signal to and from the phone company, just as he's transmitting and receiving signals from that router. But it's not the information that Corporal Erdely cared about. But by engaging, by even engaging in the process, and then, of course, tapping in, although it wasn't an actual tap, didn't he take voluntary action to expose himself? Well, he did, but actually less so. He didn't expose his computer, first of all, the location of the computer. And he didn't expose himself as much as Kylo did. Well, I take it from your answer, you've conceded that he has voluntarily disclosed. And more than that, what he has done is engage in a disclosure that engages the Kazakowski router, which is unauthorized. It was unauthorized. It's not legitimate. I would disagree. It's not against the law. Well, I take that. It's not against the law to trespass and use somebody else's Internet service? There is no, I could find no Pennsylvania case that charged somebody for using the wireless router of another person. But you would agree, though, that the router belonged to the neighbor, correct? It belonged to Comcast, who- Who paid for it, the neighbor, right? Yes. Isn't this the Ruckus situation? Isn't this precisely the, and if not precisely, highly analogous to the situation that then Justice Rehnquist referred to in Ruckus? I believe in a footnote, the burglar of the cabin. No, it's not, because Mr. Stanley was in his own home. Mr. Kazakowski was- He was in his own home, reaching out and using somebody else's router. Just as Mr. Kazakowski's router was transmitting signals that reached his home. But he wasn't, he was not encroaching upon anybody else's device or router. Again- Hence the- Yes. Hence the question of legitimacy. Well, I guess it depends on what you mean by legitimacy. I mean legitimacy in the sense that Justice Rehnquist used it in Ruckus. We would not concede that he was unlawfully using it, that it was against any law. Was it like a trespass, though? Would you agree it was like a trespass? It depends, I mean, the record, the district court avoided that issue in describing whether or not it counted as a violation of theft of services. Well, the district court kind of elided that a little bit with the whole third party disclosure doctrine tact, didn't she? I mean, that was more the course taken by the district. That's a fair reading. But there was also no finding that this was a violation of any criminal law or that it would be a basis for a court. Is that necessary? We don't think so. And the reason is, is that doesn't affect whether or not this was an intrusion into Mr. Stanley's home. Of course he revealed all this information about his wireless card, the data that he transmitted back and forth when he did it. But he didn't transmit his identity or the location of his computer. And from our point of view, is whether or not the activity looks suspicious or it looks illegitimate or it seems to implicate a criminal law, that doesn't bear on the question of whether the use of the Moocher Hunter to locate an item within his home is a search. Mr. Moyers, did Mr. Stanley have a subjective expectation of privacy? The court found that he did. Is there anything in the record to suggest he had a subjective expectation of privacy? Yes. He did this in his home. He didn't type information into his computer. Have you asserted for him anywhere in the case a subjective expectation of privacy? For example, I know Stanley didn't testify. He could have, very narrowly, at a suppression hearing. He didn't. What in the record would support, other than what you just said, he was there in his home? Well, first of all, he didn't name his computer in such a way that would have revealed to the router. When corporal looked at the router logs to see which machines were connected, there's the MAC address, there's the IP address. There was nothing to say. But it is identifiable. His computer is identifiable. It's identifiable based on serial numbers, based on the numbers in the wireless card, but it's not identifiable as his. He didn't write in, this is Richard Stanley's computer. Does the fact that he did not use his own computer for this video sharing, doesn't that cut against your argument here about legitimate expectation of privacy? No, it doesn't, because just because you may be doing something within your own home that is potentially illegal or may implicate even a tort, that doesn't make the search of your home or the use of this sense-enhancing technology to look inside your home any less legitimate. But that hypothetical statement that you just gave in response to Judge Sirica is not this case. It is a very, very delimited description, so much as really to be inaccurate, because what you've just stated did not include in the hypothetical the reaching out electronically and use of an off-premises router. But Kyla did the same thing. He used an enormous amount of electricity that they got from the Portland Gas and Electric Company. That's how they knew to start looking in that area. But was he unauthorized to do that? The record doesn't reflect that, but I wouldn't be surprised if Portland Gas and Electric would turn off somebody's service if they knew that it was being used for something that was publicly dangerous. Well, here we have a circumstance where the neighbor learned that his neighbor, Mr. Stanley, was without authorization using his router to use services the neighbor was himself paying for. Why would society recognize a legitimacy in that sort of behavior? Well, it may not recognize a legitimacy in that sort of behavior, but that doesn't mean that it wouldn't recognize the right for Mr. Stanley to reveal his location and use of his computer. So as long as Mr. Stanley is in his living room, from your point of view, society should recognize this, I'm going to call it a trespass, this conduct of unauthorized use. That's your view. But if he did it in the park bench, right outside on the sidewalk, from your point of view, there's a legitimate expectation. The legitimate expectation of privacy disappears only because he went outside. Well, then you can see the person using their computer within the range. What difference does that make? The question that Judge Schwartz has just asked really goes to the heart of the legitimacy question here, doesn't it? Again, how can there be a reasonable expectation of privacy under these facts when what you're asking is the public, which enters into the reasonableness calculus, to give its imprimatur to the conduct that Stanley engaged in? Well, I think to answer your question, it's that law enforcement officers can't tell ex ante whether that use is legitimate or not, necessarily. The rule has to be that when people are connecting to a wireless network, that they don't have society giving them that. Mr. Moyers. Yes. Why should wireless moochers receive greater expectation of privacy in their location than a legitimate Internet user? That's what you're asking here. How is that reasonable? How is the public ever going to regard that? I disagree, Your Honor. What Mr. Stanley is asking for is that he have the same Fourth Amendment rights as Mr. Kozakowski. What the information from Comcast gave to Corporal Erdley, got Corporal Erdley to the sidewalk in front of Mr. Kozakowski's house. To get him inside Mr. Kozakowski's house, he had to get a warrant. Once he had that warrant, he was able to enter the home and find which computers were on, which computers would be connected. He was able to search them. What we're asking here is that Mr. Stanley be treated the same and that Corporal Erdley can get to the sidewalk in front of his home, and we're asking that Corporal Erdley get a warrant, a search warrant, before doing something that he'd have to physically intrude otherwise to figure out. You've just led to the one final question I wanted to ask, and I was going to ask it after I inquired of my colleagues if they had further questions at this juncture, but you've mentioned a search warrant. What would be the search warrant that police should have sought here? How would the warrant request and affidavit have read, since at this point in time, all that law enforcement really knew was a general area? Yes. An advisable way to go about it would have been to recite the facts that we have information that suspect computer files are coming to this router. I, Corporal Erdley, checked the router logs and I checked the computers in the home. Nothing. I'm more interested in the locus or site of the search. It could begin within 100 feet of the Kozak house. So all residences within 100 feet? Yes, but the search could set forth how the Moocher Hunter would scan these houses and then... Does that make sense that folks in a multiple residential building are going to be subjected to a search, even pursuant to a warrant? Doesn't the enhanced intrusiveness of that suggest some lack of reasonableness even in the course of pursuing a warrant? It may at first blush, but the intrusion upon them is very minimal. And what it is, is to... And that's the cost of just protecting Mr. Stanley's Fourth Amendment right to a search. It may not be so minimal if they're growing marijuana in the front room. And the warrant wouldn't allow them to bust into every house, but it would allow... That's a pejorative term. We get the point. It would allow proper entry, pursuant to a warrant, to probably, in this physical situation, multiple residences. And unless Ernie was lucky enough to go to Stanley's the first time, to other people who are complete innocents in this situation, you would concede. Yes, but that's what the Fourth Amendment does all the time. Okay. Thank you. All right, we'll have you back in a little while. And perhaps Mr. Kokas could begin on this point we just left off on before we get into some of the other issues, and that is the practicality of the warrant process in this situation and how it would work. May it please the Court, Donovan Kokas, AUSA, on behalf of the United States. Our position has been, and always has been, from the time that we were first consulted by a corporal early about the potential use of Moocher Hunter, that it would be impracticable to go get a warrant. It would be a general warrant authorizing essentially a search of the entire neighborhood, and constitutionally that would be prohibited. So that's why we decided to use Moocher Hunter as really our best and only way to figure out who was filtering Internet access to download child pornography from Kozakowski. I'd like to begin actually just by making sure we're all on the same page about the salient facts, because it's important. Upon determining that somebody was using Kozakowski's router to download child pornography, and after ascertaining that no one in Kozakowski's house was doing this, with his permission and without trespassing on anyone's private property, we used Moocher Hunter to lock in on the signal being received at the Kozakowski router. We start there, and we go out his front door, not knowing where it's going to lead, but ultimately finding that it leads us to Stanley's front door. And the minute we determine that, we close the application, go obtain a warrant. Now that matters because this case is not Kylo. This case ends where Kylo began. Well, but isn't there language in Kylo that is something of an obstacle to you, and that is, broad though it may be, it commanded five votes, and that is, where is here the government uses a device that is not in general public use, and that doesn't seem to be an issue in this case, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a search, and is presumptively unreasonable without it. And that language is there, I can't deny it, but it can't be read in isolation, because what Kylo actually holds, and in preparing for this argument, I reread the case, and I think it uses the term emissions or emitted eight to ten times, and basically the holding is officers need a warrant when they're going to use technology to detect emissions caused by conduct that a defendant's attempting to confine to his home. Well, but that word is not used when Justice Scalia writes for the majority. We think that obtaining, by sense-enhancing technology, any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search. Well, and I think, again, it can't be read in isolation from the rest of what Kylo says. It can't be read in isolation, by the way, from what Justice Scalia wrote 12 years later in Jones, because he authored the majority opinion there, and he said that cases involving the transmission of signals without trespass continue to be governed by Katz, not Kylo. Well, I'm not trying to get into Justice Scalia's mind, but Jones was a GPS case, a car case. This is a home case. Stanley is a home case. Okay. Then let's talk about Jardines, because Jardines then holds that officers can use drug-sniffing dogs to sense the odors produced by marijuana inside a defendant's home as long as they don't trespass. So under the portion you just read me of Kylo, Jardines was decided incorrectly. Well, isn't Smith called into question also by Kylo? I'm not sure how so, Your Honor. The language in Kylo is pretty broad. Yeah. And could it, do you see it in any way undermining Smith? I don't as long as you read it in the context. I mean, again, the Kylo context is emissions caused by conduct a defendant's attempting to confine to his home. Moocher Hunter, just going back to Moocher Hunter now, that's not what we detected. We detected transmissions, active transmissions he was purposely sending outside his home, and we did that without, we detected those transmissions without trespass. And under that rubric, under, I think it's page 953 of Jones, I mean this falls almost exactly within what Jones says, it's situations involving the transmission of electronic signals without trespass are governed by cats. And that's why we argued and the district court found that that means Stanley has to prove a subjective expectation of privacy and that that expectation was objectively reasonable. Our position's always been he never even proved a subjective expectation of privacy, didn't testify or offer evidence at either of the evidentiary hearings. He, in fact, at sentencing, page 32 of the supplemental appendix I filed, he essentially admitted I used this router because I didn't care where my Internet access was coming from, it was free. Now I know the district court essentially gave him the benefit of the doubt because as Mr. Moyer says, Stanley used the computer in his own home. In his home, so he had that presumption. I think, well, but here's the problem with saying that that's a firm presumption, Your Honor, is that when you look at cats, it says the Fourth Amendment protects people and not places, and it doesn't protect what people choose to make public even if the place they choose to make it public happens to them. Except the Supreme Court has treated the home as a special place. It has. I, you know, and I concede that. But the problem is he's also conceded at page 17 of his opening brief that he made public the existence of a signal between his computer and the Kosakowski router. So it's this intentional act on his part that changes the calculus here? I think it goes a long way because the intentional act results in a transmission and not an emission like we had in Kylo. And so, you know, from my point of view, that defeats any subjective expectation of privacy he had. And moreover, you know, all of the hypotheticals he offered presuppose that we looked at the content of his communication with Moocher Hunter. And that's not the case. As Corporal Eardley said, and I find this metaphor to be very apt but also important for another reason, he said the signal was essentially an invisible coaxial cable which we could follow. And the reason I think that's important is suppose we'd gone to Kosakowski's house to investigate this crime and instead of finding that someone has stolen a wireless signal, someone has actually surreptitiously plugged a coaxial cable into his router. But we try to follow it outside and whoever has done this has been savvy enough to bury it deep underground. So we can't just pull it up. We have to get a backhoe to dig it up. On his logic, we'd need a warrant for a backhoe. Your view is that this coaxial cable analogy is like cyber footprints and you were just following it back? Essentially, yes, Your Honor. So from your point of view, if someone is in their house and they're intentionally emanating a signal, a sound, an image, and it goes outside the walls of the home, that person loses a privacy interest in what they're doing in the house to cause that signal to be sent? I think so, but the court need not even read it that broadly. In this case, it's not like someone playing loud music in their house, although I think police are called to respond to that all the time. This is someone sending a signal out to use someone else's property to get on the Internet and then make public all the content that he says we looked at through Moocher Hunter. We actually saw long before we used Moocher Hunter just by sitting on the Nutella peer-to-peer network. But yeah, to answer your question, I think that's apt. I mean, if you were transmitting a signal outside of your house, and especially if it winds up on somebody else's property using a service that person is paying for, I think you have waived it. You have not evinced at least a subjective expectation of privacy, even if you do that from the confines of your home. So the fact that in this particular case there was, I've been using the word trespass, is that the misappropriation of services destined for the neighbor? Right. Even if we didn't have that fact from your point of view, that doesn't matter? It just makes this more egregious? It makes it more egregious, but I think you're on. I mean, if I were sitting in your position, I would probably be careful to at least note that this is a very salient fact in this case, because honestly, I mean, I don't know what the technology is going to hold tomorrow. You know, if you made a holding that broad, I mean, I know my folks would love it, but I don't know if I'd feel that comfortable just because five years from now something could come out that would make it, you know, very dubious. Why doesn't then it make sense from your standpoint as well as the prudential reasons you've just expressed to go the route of the legitimacy, if you will, well-known, of this disclosure as opposed to pure third-party disclosure doctrine? Right. I mean, well, Your Honor, I mean, from our perspective, I think that what the district court did was arguably both. I mean, I saw cases... I understand, but my point is, aren't there, given the evolution of the technology that you have just referred to and that we cannot, that we can anticipate as a fact, but not in detail, suggest enormous potential for problems with a more expansive ruling based on pure third-party disclosure? There could be. I mean... You have consistently used the word signal. Yes. And I'm not sure what that means. I mean, does that mean that the entire signal, if it was disclosed to a third party, then exposes the person who discloses it to unlimited inspection or whatever that signal is? No. I mean, we're not arguing that, Your Honor, in this particular case. But isn't that a potential difficulty if pure third-party disclosure doctrine were invoked here to uphold the order that you are defending? It would be if the court were not careful to note, as I've tried to note, that we only used Mutcher-Hunter to follow the signal as though it were the virtual coaxial cable. We did not look at it. We did not use Mutcher-Hunter or any other technology to examine the content of the signal. We knew the content because he was making it public over Nutella. But we don't need... We would not need, if we went that route, this analogy to the coaxial cable, would we? I mean, if it was based purely on reasonable expectations of privacy and the legitimacy of that expectation based upon the mooching that took place. And, Your Honor, I mean, whether you need it or not, I don't know. I mean, I just found it an apt way to visualize something that's inherently invisible. But, you know, as to the legitimate expectation of privacy, I mean, Serralo says we look to see what society would be prepared to accept. And our position has been that Pennsylvania has already spoken by saying, writing a statute broadly enough to cover this scenario, that basically outlawing stealing someone else's... You've not pressed that real hard, though, have you? I haven't pressed it that hard. And, frankly, it's because, like Mr. Moyers, I looked. I couldn't find cases involving a prosecution for this. But I think it's certainly instructive as to what the legislature thinks. I mean, they wrote this statute pretty broadly. But even if you put aside the statute, assume it's not illegal for Stanley to be doing what he did, he still has to prove he had an affirmative right to be on Kozakowski's router. And the reason that's the case is Raichus says a person doesn't have a legitimate expectation of privacy in a place he has no right to be. He had no right to do this to Kozakowski. I mean, imagine, I mean, that's got to be a tough day for your marriage when police show up and your wife is there and they say, we've got a warrant, we've got child pornography all over your computers. That's precisely why I don't think the public would be prepared to accept him having an expectation of privacy broader than the one that Kozakowski had. And we know this would be broader because if Kozakowski had, in fact, had child pornography, we would have found it after the execution of that first warrant. On the theft analogy or the trespass analogy, don't we have a problem because it was actually his signal that went out. That is, he didn't steal that particular signal. He just joined in somebody else's. No, Your Honor. And he, the way the tech, the way, and I hope I made this clear, for him to connect to Kozakowski's router, he had to turn on his computer, go to the icon that says search for wireless networks, click on Kozakowski's, and he would do this because he wouldn't see a little lock symbol next to it. He would know it was unsecured. His computer then sends a signal out to Kozakowski's router. Then in response to that, once he gets onto the Internet through the router, he receives a signal back. And it basically happens simultaneously. It would be like separating the dancer from the dance, I would say. So I don't know that it's, I don't think this creates a problem. Well, maybe, yeah. Maybe I'm parsing it too finely. And the technology is such that you don't have to do that. Yeah. But are you, I'm still, I'm not sure whether you're, whether you're pressing a theft theory here or a third-party theory or both. Well, both. I mean, we're not confined to the district court's reasoning under AGNU, so we're pressing both. Unless the court has more questions about them. Well, I have one question. Since you mentioned the district court's ruling, the district court sought to distinguish, Kylo, in one way I'm thinking in particular, and that was by saying in that case the agents actually knew the spot, the residence, the target they were going after. And in this case they did not. You don't take up that point. And I'm wondering if it's one that you don't consider to be, to have any particular force. No, I do take it up, Your Honor. And the reason is, this is why when I was starting out distinguishing this case from Kylo, I said that this case ends where Kylo begins. Kylo begins with officers already knowing the house that they're looking for, already suspecting somebody inside is growing marijuana, but instead of stopping and attempting to obtain a warrant based on those suspicions, they essentially conducted a search of the entire house from the outside by using this infrared technology. That's not what we did. Ours led him to his front door. We didn't know where in his house his computer was. You know, we stopped as soon as we learned it went to his house and got a warrant. If I could speak just for a minute on the other two issues, I see I'm out of time. But the tracking device issue, of course, the court doesn't have to reach, you know, unless there's a Fourth Amendment violation. But I would point out just one absurdity, I think, in the argument, or one potential for absurdity. The tracking device issue came up at the last minute, even in the district court, if I recall. It did. I mean, you know, it didn't come up so late that I could say it was waived. It came up pretty much at the time of the hearing. Yeah, the day before. There had not even been an opportunity, the government not even had an opportunity to reply. Right, right. What I'd say about that, though, is, you know, suppose we'd gone to Kozakowski's house to investigate a stolen computer, the actual hardware, not a signal. And we show up. It's a pitch-dark night. You can't see your hand in front of your face, but it's freshly snowing. And we go inside, and Kozakowski says, yes, someone's stolen my computer, and they left through yonder door because it was open when I got home. So the officer goes and looks out the door. He can't see anything, but he turns on his flashlight, and lo and behold, he sees fresh footprints leading to Stanley's house. On his logic, that flashlight would be a tracking device. And, by the way, the backhoe that I mentioned earlier, that would be a tracking device. I mean, I think you do have to, albeit district court cases, you have to read the district court cases that I cited, which flesh out what I have to admit is a pretty broad statute about the tracking device. And then the last issue about the exclusionary rule, I recognize Katzen, you know, came out differently on the issue, but it's pending rehearing in bank. I cited Aguiar in my 28-J letter. We would just ask if the court decides this case, based on the good-faith exception, the exclusionary rule, that it holds this matter CAV pending the in-bank decision in Katzen. Thank you. Thanks very much. Rebuttal, Mr. Moyers. Yes, Your Honor. May it please the court. The first issue I'd like to address is the problem the court raised earlier of, what was the warrant process to look like to use the Moocher Hunter? And I described generally what that might look like, but I also wanted to attack the underlying thinking of it, which is that here we have the government complaining, saying that to get a warrant would have been impossible, because it would have been too broad an area and or it lacks sufficient probable cause to justify a search within that area. And what's perverse about that is they're arguing, look, it's too broad or lacks probable cause for a warrant search, so we have to be able to do a warrantless search. That strikes me as very odd and inconsistent with the law. Normally, when we don't have probable cause or the scope is too big, that's going to defeat, that's a good reason not to do the search under the Fourth Amendment. So this argument that it was impossible or difficult for the government to get a warrant to use this device, first of all, we just deny as a matter of fact, and second of all, we argue that the implications of it are at odds with the Fourth Amendment. The second issue I wanted to bring up is the idea of the invisible cable or the backhoe. What would happen, even if under that hypothetical, is say they trace the cable underneath the ground to Mr. Stanley's home. The government would still need a warrant to dig up the cable once it was on Mr. Stanley's property, and it couldn't know for sure where the cable went unless and until it was able to get on the property and see that it went into Mr. Stanley's unit. And then, even still, they'd need a warrant to be able to enter the house and look for where they suspected the cable would end. So from our point of view, the case wouldn't come out any differently. What we're just asking is that when the government or when law enforcement agents seek to pinpoint with accuracy something inside a suspect's home, that they get a warrant to use that device because it's basically a workaround for physically intruding upon the home. Mr. Moyer, just one quick question. It doesn't really matter to the outcome of this case whether or not the Moocher Hunter was a tracking device, does it? I can say that if the court finds that the third-party doctrine applies, that would foil both of them. The district court didn't resolve it. How does it matter, then? Yes, if the court finds that this wasn't a search for Fourth Amendment purposes, then the tracking device argument doesn't come into play. Thank you very much. Thank you. Thank you to both sides for a well-briefed and well-argued case in a very interesting matter, especially for people like me who are, if not technophobes, downright Luddites. So I appreciate your very helpful arguments.